UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRIST BOLLANO,

Plaintiff,

Case No.: 2:24-cv-10900

v.                                                                    Hon. Gershwin A. Drain

SUN COMMUNITIES, INC.,

Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF No. 26] AND DENYING AS MOOT DEFENDANT'S PARTIAL MOTION TO DISMISS [ECF No. 25] AND PLAINTIFF'S MOTION TO STRIKE [ECF No. 28]**

Presently before the Court is Defendant Sun Communities, Inc.'s Motion for Summary Judgment, Defendant's Partial Motion to Dismiss, and Plaintiff Krist Bollano's Motion to Strike. The Court concludes that a hearing will not aid in the disposition of these motions and will determine the outcome on the briefs. E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, Defendant's Motion to

1

Dismiss is DENIED AS MOOT, and Plaintiff's Motion to Strike is DENIED AS MOOT.[1]

## I.   BACKGROUND

Defendant Sun Communities, Inc. is a Real Estate Investment Trust that owns or has an interest in 671 mobile home and recreational vehicle properties, with over 180,060 developed sites, across the United States, Canada, Puerto Rico, and the United Kingdom. ECF No. 26-3, PageID.240. Defendant has thousands of employees. *Id.* Plaintiff Krist Bollano was employed as a Team Relations Specialist ("TRS") for Defendant from August 2022 to September 2023. ECF No. 26-5; ECF No. 29-9.

### a.  Plaintiff's Duties

The TRS team works in Defendant's office in Southfield, Michigan, and each individual TRS is assigned a region comprised of various properties, over which the TRS is the "main point of contact for… HR-related issues." ECF No. 26, PageID.176. Plaintiff worked "about ten-hour days" "[a]lmost every day." ECF No. 29-3, PageID.614. Plaintiff testified that his job entailed reviewing Defendant's policies, reviewing employment laws, and conducting HR-related investigations. *Id.*

---

[1] Defendant's Motion to Dismiss argues that Plaintiff's Title VII claim is partially unexhausted with the EEOC. Plaintiff's Motion to Strike argues that Defendant's Motion to Dismiss is procedurally improper. Because the Court disposes of the Title VII claim on summary judgment for the reasons provided in Defendant's Motion for Summary Judgment, both of these motions are moot.

at PageID.593–94. The job also involved supporting managers "in building Sun's culture and adhering to human resource policies and procedures, as well as advocating for team member's best interests." ECF No. 29-1, PageID.530.

Plaintiff's HR investigations would determine whether a policy was violated by an employee. ECF No. 29-3, PageID.595. He would collect evidence and interview the parties involved to substantiate the claims and allegations. After concluding his fact-finding, Plaintiff would put his conclusions—such as which facts he was able to confirm, and which facts he believed to be true or not and why—into Origami, Defendant's HR document management system. *Id.* at PageID.596. From there, the disciplinary process against an employee could begin. The progressive disciplinary actions that could be taken against employees, from least to most serious, were verbal coaching, verbal warnings, performance counseling notices ("PCNs"), and terminations. *Id.*; ECF No. 29-1, PageID.531.

Plaintiff's role required him to be involved in the disciplinary process as a support and resource for managers. ECF No. 29-3, PageID.654–55. However, it was the job of managers to determine how to structure discipline, and Plaintiff had no control over a manager's disciplinary decisions. *Id.* at PageID.596. There is conflicting evidence about the amount of input a TRS had in even *recommending* discipline to a manager. Plaintiff testified that a TRS was not allowed to give a solid "conclusion as far as… [the] level of discipline that [an employee] should get." *Id.*

3

at PageID.596–97, 600. Indeed, Plaintiff was advised not to give recommendations or tell a manager what to do; rather, he was required to simply "lay out the options" for managers. ECF No. 26-50, PageID.434; *see also* ECF No. 26-36, PageID.369. Other evidence, such as Plaintiff's resume and Defendant's description of the TRS position, suggests that TRS employees had more authority to give assertive recommendations about how a manager should act in any given case. ECF No. 26-6, PageID.248; ECF No. 26-7, PageID.251.

Additionally, Plaintiff's work was closely monitored by his supervisors. Plaintiff testified that he could not think of a single HR case that his supervisors were not also involved with, and that they would "nudge [him] in the direction that they want[ed] him to go" in the investigatory and disciplinary process. ECF No. 29-3, PageID.654–55. Plaintiff further testified that if a supervisor did not agree with his conclusions, their conclusions would govern. *Id.* at PageID.655. One example is drafting PCNs. While Defendant's internal policies would suggest that this is solely a duty of the TRS, ECF No. 29-1, PageID.532, Plaintiff testified that he had to submit PCNs to his supervisors who would almost completely rewrite it, so that "it was not really [his] product as far as what it was." ECF No. 29-3, PageID.601.

Plaintiff also had other job duties. His position entailed coaching supervisors on leadership skills, documenting cases in Origami, administering exit interviews, advising management on HR policies and employment laws, answering basic

compensation and benefit questions, assisting management in creating and revising job descriptions, conducting timekeeping audits, and posting job openings. ECF No. 26-7, PageID.251.

In his personal resume, Plaintiff described his job duties as a TRS, explaining that he "act[ed] as a trusted subject matter expert and primary point of contact for employee-related concerns"; "provided expert guidance to leadership, ensuring compliance" with various employment laws; "successfully mediated and resolved employee conflicts"; "conduct[ed] comprehensive investigations"; "collaborate[d] closely with senior leadership to optimize performance management processes"; "developed and enforced 'Performance Improvement Plans'"; and "[led] training initiatives", to name a few. ECF No. 26-6, PageID.248.

### b. Plaintiff's Performance and Discipline

Beginning in December 2022, managers of Defendant's properties, Regional Vice Presidents ("RVPs"), and District Vice Presidents ("DVPs") began to clash with Plaintiff. One manager was highly dissatisfied with the way Plaintiff handled an HR investigation, ultimately citing her interaction with Plaintiff as one of the reasons she decided to resign. *See* ECF No. 26-18; ECF No. 26-19. Another manager felt that Plaintiff was "accusatory," "berating," and "belittling" in their conversation regarding a policy violation, even though she repeatedly apologized and admitted wrongdoing. ECF No. 26-20, PageID.315. That manager also resigned, and although

5

she did not cite the conversation with Plaintiff as the reason for it, she stated that Plaintiff "treated [her] very rudely." *Id.*; ECF No. 26-22, PageID.327. Two of Plaintiff's supervisors, Rochelle Wilke and Kim Knapp, addressed these issues with Plaintiff in a verbal coaching, advising him to work on empathy, proactive listening without taking sides, and acting based on facts and not emotions or opinions. *See* ECF No. 26-23, PageID.329.

Shortly thereafter, an RVP complained that Plaintiff was "very abrupt and too direct" while conducting a fact-finding investigation regarding an employee's wrongdoing; Plaintiff "continued to berate" the employee after the employee had admitted the transgression, and "ask[ed] her the same question over and over in a rude manner." ECF No. 26-24, PageID.331. The following month, another manager complained about Plaintiff being "too aggressive" during a phone call with her. ECF No. 26-26, PageID.336. She stated that Plaintiff kept her on the phone for over an hour, never explained the purpose of the call, verbally berated her about her performance as a manager, and told her that she was "butt hurt." *Id.* at PageID.337. The manager concluded that the call was "unproductive and unprofessional" and that she preferred "not to deal with" Plaintiff. *Id.*

In response to these events, one of Plaintiff's supervisors, Derek Greco, reached out to an RVP to get his opinion on Plaintiff. That RVP stated that Plaintiff tends to "get involved with things he really doesn't need to. And, instead of a 5-

minute conversation, it takes an hour." ECF No. 26-27, PageID.340. The same RVP told Ms. Knapp that Plaintiff is "long-winded," "likes to play psychologist," "rehashes things," and "confuses the team." ECF No. 26-29, PageID.346. Similarly, a DVP also reported that Plaintiff "bring[s] out the issues" and "keeps talking until he is given something." *Id.* He asserted that Plaintiff "is not a good fit for the team[.]" *Id.* Mr. Greco then made the decision to give Plaintiff a verbal warning. ECF No. 26-28, PageID.344; ECF No. 26-31. In the warning, Plaintiff was told to actively listen, summarize conversations, be brief in his conversations, refrain from asking the same questions repeatedly, and be friendly and neutral. ECF No. 26-31.

In June 2023, Plaintiff received a call from Stacy Fleming, a Guest Service Coordinator at Defendant's "Leaf Verde" property. Ms. Fleming stated that a resident, who was technically banned from the community but was staying there under his wife's reservation, threatened her and was coming to attack her, but was stopped by some of the community's maintenance technicians. ECF No. 29-11, PageID.839. About a month later, in July 2023, Plaintiff received a complaint from Crystal Shilander, a Community Manager at Defendant's "Sunset Ridge" Property. Ms. Shilander said that a maintenance technician, Tim Bentley, had sent her a sexually harassing message. ECF No. 29-14.

Plaintiff's supervisors did not like the way Plaintiff handled these two situations, and decided to give Plaintiff a formal PCN on July 24, 2023. Mr. Greco

7

explained that in regard to the Leaf Verde incident, Plaintiff had made the following errors: (1) he instructed the RVP how to handle the violent resident, but it was not Plaintiff's job to advise on resident issues; (2) he had offered Ms. Fleming the possibility of booking a hotel to help her feel safe, but did not check with the RVP before determining whether this was actually viable; and (3) he advised the RVP that the community manager should be terminated for allowing the violent resident onto the property again, before ever talking to the manager and despite the RVP finding that the manager had followed protocol. ECF No. 26-36, PageID.369. In regard to the Sunset Ridge incident, Mr. Greco explained that Plaintiff had erred in recommending that Mr. Bentley be terminated, because Ms. Shilander and the RVP did not feel that terminating the employee was warranted, despite the discomfort that the message caused. *Id.* at PageID.370; ECF No. 26-35, PageID.367; ECF No. 26-32, PageID.357–58.

Mr. Greco included other incidents of misconduct in the PCN, including that (1) Plaintiff had recommended that an RVP bend the rules for a resident by giving him a rent discount; (2) Plaintiff failed to reclassify an employee from seasonal to regular; and (3) Plaintiff had multiple open cases in Origami with no documentation in them. ECF No. 26-36 at PageID.370. Around this time, one RVP complained to Mr. Greco that Plaintiff "makes issues bigger than needed and makes situations worse," comes to conclusions without fully investigating, injects his opinions, and

8

undermines her leadership. ECF No. 26-32, PageID.357; ECF No. 26-33, PageID.361. Plaintiff appealed the PCN, asserting that it contained errors, was inconsistent and self-contradictory, was unclear, and was not based on methodological decision-making. ECF No. 29-18, PageID.981.

In September 2023, Plaintiff investigated a situation at Defendant's "Sun Outdoors Canyonlands Gateway" property, where an employee stated that a maintenance technician, Tim Vittetoe, wrote him a threatening letter. ECF No. 29-19, PageID.985. Plaintiff interviewed Mr. Vittetoe, who did not deny that he wrote the letter. *Id.* The manager of the community stated that he wanted to terminate Mr. Vittetoe's employment, and both Plaintiff and the RVP agreed. *Id.*; ECF No. 26-42, PageID.397. However, Plaintiff's supervisor, Ms. Wilke, did not believe that termination was warranted for multiple reasons, and claimed that the better option would be to give Mr. Vittetoe a PCN. ECF No. 26-43. Plaintiff sent Ms. Wilke a detailed reply expressing his disagreement. ECF No. 26-44, PageID.408–09.

While reviewing the HR case against Mr. Vittetoe, Ms. Wilke discovered one of Plaintiff's cases (having to do with Mr. Vittetoe's wife, who was also an employee) that was closed without any fact finding. Plaintiff's supervisor, Ms. Knapp, reached out to Plaintiff and explained why this failure to document was improper. ECF No. 26-45, PageID.418–19. Plaintiff agreed that he should have had better documentation, but asserted that he decided to take a "passive approach" to

9

the issue because of the lack of credibility of the complainant. *Id.* at PageID.416–17. Thereafter, Plaintiff's supervisor Alexis Bogoevski began an audit of Plaintiff's cases, and discovered several cases that had been closed despite no investigation or outreach to witnesses, including one involving timecard fraud. ECF No. 26-46, PageID.422. Ms. Bogoevski claimed that Plaintiff brushed off her concerns and did not take responsibility. *Id.* Plaintiff countered that Ms. Bogoevski misconstrued his explanations for the closures. ECF No. 29-3, PageID.649. Regardless, Ms. Bogoevski recommended that Plaintiff be terminated. ECF No. 26-46, PageID.422. The Senior Vice President of People & Culture, Margi Fox, approved his termination. ECF No. 26-48.

On April 9, 2024, Plaintiff filed the instant action against Defendant, alleging that Defendant violated the Fair Labor Standards Act ("FLSA") by failing to pay him overtime and retaliated against him in violation of Title VII and the Elliot-Larsen Civil Rights Act ("ELCRA"). *See* ECF No. 21. Defendant moved for summary judgment on June 30, 2025, claiming that Plaintiff is not entitled to overtime pay because he falls into the administrative exemption of the FLSA and that Plaintiff fails to state a claim under Title VII or the ELCRA.

10

## II.    LAW & ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" by identifying portions of the record that demonstrate an absence of a material dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a "properly supported motion for summary judgment is made," the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must construe all reasonable inferences in favor of the nonmoving party when conducting its analysis. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It "may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment; only the finder of fact can make such determinations." *Doe v. Snyder*, 449 F. Supp. 3d 719, 727 (E.D. Mich. 2020).

### B.  Fair Labor Standards Act – Overtime Violations

Plaintiff alleges that Defendant failed to pay him overtime as required by the FLSA. In its Motion for Summary Judgment, Defendant does not contest that

11

Plaintiff worked over 40 hours per week or that it did not pay him overtime wages. Rather, Defendant argues that it did not have to pay Plaintiff overtime wages because he falls into the "administrative exemption" of the FLSA. ECF No. 26, PageID.188. In response, Plaintiff contends that he did not exercise discretion and independent judgment, and therefore does not qualify for the administrative exemption. ECF No. 29, PageID.516. Furthermore, Plaintiff argues that Defendant has not provided any evidence demonstrating what Plaintiff's "primary duty" was. *Id.* at PageID.520.

The FLSA "requires employers to pay their employees time-and-a-half for work performed in excess of forty hours per week[.]" *Acs v. Detroit Edison Co.*, 444 F.3d 763, 764–65 (6th Cir. 2006); *see* 29 U.S.C. § 207(a)(1). However, certain employees are exempted from this overtime pay requirement; namely, bona fide "executive, administrative, or professional employees[.]" *Perry v. Randstad Gen. Partner (US) LLC*, 876 F.3d 191, 196 (6th Cir. 2017) (quotation marks omitted); *see* 29 U.S.C. § 213(a)(1). The Code of Federal Regulations defines an "administrative" employee as one:

> (1) Compensated on a salary or fee basis at not less than the level set forth in § 541.600;[2]
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

---

[2] This amount is $1,128 per week as of January 1, 2025. *See* 29 C.F.R. § 541.600(a)(2).

29 C.F.R. § 541.200(a). "The exemption is to be narrowly construed against the employer, and the employer bears the burden of proving each element by a preponderance of the evidence." *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 642 (6th Cir. 2013). While an employee's qualification for the administrative exemption is a question of law, the duties that the employee performs on a day-to-day basis and the extent of discretion an employee exercises are questions of fact. *See Henry v. Quicken Loans, Inc.*, 698 F.3d 897, 901 (6th Cir. 2012); *see also Renfro v. Ind. Mich. Power Co.*, 233 F. Supp. 2d 1174, 1180 (W.D. Mich. 2002).

### a.  A Question of Fact Exists Whether Plaintiff Qualifies for the Administrative Exemption

As noted above, the only aspects of the administrative exemption that are in dispute are Plaintiff's "primary duty" and whether he exercises discretion and independent judgment. Upon consideration of the parties' arguments, the Court concludes that questions of material fact exist that preclude summary judgment on Plaintiff's FLSA overtime claim.

As an initial matter, to determine whether Plaintiff "exercised discretion and independent judgment such that [he was] covered by the administrative exemption," the Court "must decide whether [his] 'primary duty' was 'the performance of exempt work.'" *Perry*, 876 F.3d at 207; *see* 29 C.F.R. § 541.700(a). The Code of Federal Regulations defines the term "primary duty" as "the principal, main, major, or most

important duty that the employee performs." 29 C.F.R. § 541.700(a). The Code also provides factors to consider when determining whether an employee's duty is his primary duty, including: (1) the relative importance of the exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* In other words, determining the primary duty requires a "totality-of-the-circumstances analysis[.]" *Perry*, 876 F.3d at 208.

Defendant offers no evidence or argument regarding what Plaintiff's primary duty is. When Plaintiff pointed out this deficiency in response, Defendant replied in a footnote, citing certain FLSA overtime cases that did not address the "primary duty" issue[3] and arguing that it is not required to prove the hours Plaintiff worked on his individual tasks. While it is true that "[t]ime alone… is not the sole test" for determining an employee's primary duty (although it tends to be an important and often dispositive consideration), 29 C.F.R. § 541.700(b), a defendant still must

---

[3] Defendant cited *Farnham v. Riimic, LLC*, No. 12-60153-CIV, 2012 WL 5187851, at *4–*5 (S.D. Fla. Oct. 19, 2012) and *Margret v. U.S. Farathane, LLC*, No. 2:22-cv-10462, 2023 WL 4492476, at *4–*5 (E.D. Mich. May 17, 2023). The fact that these cases did not analyze the "primary duty" is not dispositive. If the parties did not specifically contest the issue in the briefing, the courts would not have had occasion to discuss it. In contrast, Plaintiff specifically raised the issue here.

14

establish that an exempt duty is the plaintiff's primary duty in some sense of the term. *See Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 406 (6th Cir. 2004) (denying summary judgment where there was insufficient record evidence to determine primary duty); *Hardesty v. Kroger Co.*, No. 1:16-cv-298, 2020 WL 7053358, at *5 (S.D. Ohio Dec. 1, 2020) (determining the plaintiff's primary duty based on the time spent on tasks and the relative importance of them compared to other tasks).

The record is clear that Plaintiff had many varied job duties, including conducting investigations, documenting cases in Origami, drafting reports, communicating with superiors and employees, and performing timecard audits, among other obligations. *See* ECF No. 26-6; ECF No. 26-7; ECF No. 26-8. Defendant has not distinguished between duties in its analysis of whether Plaintiff exercised discretion and independent judgment, and Defendant has provided no evidence pertaining to the time spent on these duties or their relative importance. As such, the Court simply has no evidence (or even argument from Defendant) to enable it to determine whether Plaintiff's primary duty is exempt or nonexempt work. *See McGill v. Nashville Tenn. Ventures, Inc.*, No. 3:19-cv-00922, 2022 WL 1914294, at *5 (M.D. Tenn. June 3, 2022) (denying summary judgment where defendant provided no evidence regarding the time plaintiff spent on exempt duties and the relative importance of plaintiff's duties).

15

Closely interrelated with this issue is the parties' dispute over whether Plaintiff exercised discretion and independent judgment. "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Factors to consider include, but are not limited to:

> (1) whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;
> (2) whether the employee carries out major assignments in conducting the operations of the business;
> (3) whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
> (4) whether the employee has authority to commit the employer in matters that have significant financial impact;
> (5) whether the employee has authority to waive or deviate from established policies and procedures without prior approval;
> (6) whether the employee has authority to negotiate and bind the company on significant matters;
> (7) whether the employee provides consultation or expert advice to management;
> (8) whether the employee is involved in planning long- or short-term business objectives;
> (9) whether the employee investigates and resolves matters of significance on behalf of management; and
> (10) whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.*(b) (numbering added).

Generally, the exercise of discretion and independent judgment "implies that the employee has authority to make an independent choice, free from immediate

direction or supervision." *Id.*(c). But this standard "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." *Id.* Rather, discretion and independent judgment may be found even where the employee merely gives "recommendations for action rather than the actual taking of action." *Id.* In contrast, discretion and independent judgment entails "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." *Id.*(e).

An employee who is constrained by guidelines and procedures still exercises discretion and independent judgment if those guidelines and procedures "contemplate independent judgment calls or allow for deviations." *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 577 (6th Cir. 2007). There is no discretion or independent judgment used in "clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work." 29 C.F.R. § 541.202(e).

Defendant argues that Plaintiff qualifies for the administrative exemption by heavily emphasizing the way Plaintiff described his duties in his resume. ECF No. 26, PageID.190. The Sixth Circuit has noted, however, that the job descriptions that employees write for their resumes do not "preclude [them] from arguing that [their] day-to-day activities differ from those described in these documents—such actions merely raise credibility questions for the factfinder." *Schaefer*, 358 F.3d at 400–01.

17

The Sixth Circuit recognized that "resumes may not provide the most accurate picture of an employee's job because resumes are typically 'designed to enhance the employee[']s duties and responsibilities in order to obtain a job.'" *Id.* at 401 (quoting *Ale v. Tenn. Valley Auth.*, 269 F.3d 680, 689 n.2 (6th Cir. 2001)). Thus, the Court does not ascribe dispositive weight to Plaintiff's resume.[4] Rather, the Court must look at all the evidence regarding Plaintiff's day-to-day duties. *See id.* at 400.

Beginning with Plaintiff's duty to perform investigations and give disciplinary advice to management,[5] Plaintiff's resume and his general job description portray a role with discretion and independent judgment. As described in the Code of Federal Regulations, making recommendations and giving counsel to management may constitute the exercise of discretion and independent judgment. 29 C.F.R. § 541.202(c). Accordingly, courts have acknowledged that the duty to give management recommendations on how to act may qualify an employee for the administrative exemption. *See Margret*, 2023 WL 4492476, at *4; *Farnham*, 2012 WL 5187851, at *4–*5.

---

[4] In his deposition, Plaintiff testified that "for the most part" he believed his resume was accurate, but he also explained that there are "multiple ways" a job description can be described and that it is "open to interpretation." ECF No. 29-3, PageID.592.
[5] These duties seem to be the ones primarily at issue here. Most of the facts and evidence in this case relate to Plaintiff's duty to investigate HR complaints and to counsel management regarding discipline. To the extent this constitutes Plaintiff's "primary duty," the Court cannot make such a determination without any reasoned argumentation.

However, other evidence contradicts the notion that Plaintiff had any real authority to give recommendations on disciplinary matters. Plaintiff testified that he was instructed to simply lay out the facts and options for managers, and not to give recommendations. ECF No. 29-3, PageID.599–600. Plaintiff explained that he could arrive at conclusions about whether a policy was violated and how it occurred, but could not give advice on a level of discipline. *Id.* at PageID.600. This contention is supported by an email chain between Ms. Wilke and Plaintiff, wherein Ms. Wilke admonishes Plaintiff for recommending that a manager issue a PCN against an employee rather than "laying out the options and allowing [the manager] to choose." ECF No. 26-50, PageID.433–34. Indeed, Defendant even states in its motion that Plaintiff's PCN discipline was based, in part, on recommending termination of Mr. Bentley, the employee involved in the Sunset Ridge incident, because Plaintiff was not allowed to give his opinions. *See* ECF No. 26, PageID.196; ECF No. 26-36, PageID.370; *see Albertin v. Nathan Littauer Hosp. and Nursing Home*, 537 F. Supp. 3d 243, 262 (N.D.N.Y. 2021) (denying summary judgment on the administrative exemption issue where every time the employee was disciplined, it was because the employee "made an independent choice or did not come to [her supervisor] before acting.").

Additionally, Plaintiff testified that his supervisors were involved in all his investigations, "nudg[ing him] in the direction that they want[ed him] to go," and

19

that he ultimately had to follow their lead on how to handle any given situation. ECF No. 29-3, PageID.654–55. This assertion is supported by other evidence, such as Ms. Wilke's reversal of Plaintiff's suggestion that Mr. Vittetoe be terminated, and Plaintiff's deposition testimony describing how his supervisors would almost entirely rewrite the PCNs he drafted.

As such, there is a question of fact whether Plaintiff's investigatory-related duties qualify for the administrative exemption. If Plaintiff's version of facts is to be believed, his investigatory duties simply entailed "applying well-established… procedures or specific standards" to the situations he investigated, which does not entail the exercise of discretion or independent judgment. 29 C.F.R. § 541.202(e). "There is a clear and pivotal difference between duties that involve putting management policies into effect[,]" either directly or via a recommendation to management, and "duties that involve informing other employees about those policies." *Rainey v. Am. Forest and Paper Ass'n, Inc.*, 26 F. Supp. 2d 82, 97 (D.D.C. 1998). "Both require knowledge and understanding of such policies, to be sure; but administrative duties described by the… regulations require a position of sufficient authority to enable an employee to decide how such policies will be put into place." *Id.*

Only being empowered to collect information and connect the facts to possible company policies, without any authority to do more than simply inform managers

20

about those facts and policies, does not rise to the level of exempt work. *See id.*; *see also Weeks v. Matrix Absence Mgmt. Inc.*, No. CV-20-00884-PHX-SPL, 2023 WL 3650470, at *5 (D. Ariz. May 25, 2023) (denying summary judgment where the plaintiffs presented evidence that their primary duty "merely involved the application of standards prescribed by client policies and the applicable law" using the employer's procedures and guidelines). Moreover, Plaintiff's supervisors' "extensive control" over Plaintiff's investigations "colors the evidence to such an extent that a reasonable jury could conclude that [P]laintiff did not exercise independent judgment and discretion on matters of importance[.]" *Albertin*, 537 F. Supp. 3d at 262 (denying summary judgment where the plaintiff was disciplined when she did not adhere to the defendant's exact directives, despite the fact that she was nominally allowed to act with discretion and independence on matters of importance).

Of course, Plaintiff had other duties. Some of those duties could arguably qualify as exempt, such as ensuring compliance with employment laws and providing guidance to managers on that issue, *see Farnham*, 2012 WL 5187851, at *4, and developing and leading training initiatives. *Morales v. Compass Grp., PLC*, No. CV 13-9231-JFW (MANx), 2014 WL 5304913, at *7 (C.D. Cal. Oct. 16, 2014). Other duties arguably would not, such as handling payroll reports, onboarding and offboarding, documentation, and other routine paperwork. *See Perry*, 876 F.3d at

21

208 (stating that handling payroll and processing paperwork is nonexempt). Plaintiff testified that some of these more rote duties consumed much of his time. *See* ECF No. 29-3, PageID.651. But as the Court explained, Defendant has not offered argument or evidence to establish whether Plaintiff's primary duty should be considered his exempt or nonexempt tasks.

The Court is cognizant that the administrative exemption must be construed narrowly against the employer, *see id*. at 196, and that it must make all reasonable inferences in favor of Plaintiff, the nonmoving party. Based on the foregoing, the Court concludes that Defendant's Motion for Summary Judgment is denied as to Plaintiff's FLSA overtime claim (Count I).

## C. Retaliation Under Title VII and the ELCRA

Plaintiff alleges that he was terminated in retaliation for investigating reports of discrimination and harassment and opposing such discrimination and harassment. Defendant argues that Plaintiff has not demonstrated a question of material fact on this issue. Defendant claims that (1) most of Plaintiff's actions do not constitute "protected activity," (2) Plaintiff has failed to prove a causal connection between protected activity and the adverse employment actions (PCN and termination),[6] and

---

[6] Defendant also argues that the PCN against Plaintiff was not an adverse employment action, although it does not contest that his termination was. "Context matters" when determining whether an action constitutes an "adverse employment action" for the purpose of a *prima facie* case of retaliation; the question is whether the action could have dissuaded a reasonable worker from making or supporting a

22

(3) Plaintiff cannot show pretext for Defendant's legitimate and nondiscriminatory reasons for his termination.

Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees… because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3. The ELCRA similarly provides that:

> [A] person shall not… [r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

Mich. Comp. Laws § 37.2701(a). When analyzing claims under Title VII and the ELCRA, the "analysis is identical." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012).

---

charge of discrimination. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68–69 (2006). Courts have gone both ways on whether performance evaluations and write-ups constitute adverse employment actions, based on the unique facts and circumstances of the cases. *See Hill v. Nicholson*, 383 F. App'x 503, 509 (6th Cir. 2010) (finding it is not an adverse employment action); *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) (finding it is an adverse employment action). Here, as both parties alluded to this factually intensive issue in a somewhat perfunctory manner, the Court assumes for the sake of argument that the PCN is also an adverse employment action and resolves the Title VII and ELCRA claims on other grounds.

When there is no direct evidence of retaliation, as in this case, a plaintiff must establish a *prima facie* case of retaliation under the *McDonnell Douglas* burden-shifting framework. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003). To establish a *prima facie* case, a plaintiff must demonstrate that (1) he engaged in activity that Title VII protects; (2) the defendant knew that he engaged in this protected activity; (3) the defendant took an employment action adverse to the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action exists. *Id.* If the plaintiff establishes the *prima facie* case, the burden shifts to the defendant to demonstrate a "legitimate, nondiscriminatory reason" for its action. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344 (6th Cir. 2021). If the defendant produces such a reason, "the burden shifts back to the plaintiff to show that the proffered reason was a mere pretext for discrimination." *Id.*

### a. Most of Plaintiff's Factual Allegations Do Not Constitute Protected Activity

As Defendant points out, Plaintiff's complaint does not specifically identify which of his actions constitute alleged "protected activity" (and Plaintiff's response brief does little to enlighten us on this issue); rather, Count II (ELCRA) and Count III (Title VII) merely refer to all the paragraphs in the background section of the complaint. ECF No. 21, PageID.111–12. The background section contains numerous factual allegations about specific actions, including (1) investigating a claim of racial

and disability discrimination,[7] (2) investigating a Fair Housing Act ("FHA") complaint, (3) informing higher ups that his supervisor, Ms. Knapp, allegedly made an inappropriate comment about his sexuality, (4) investigating the Leaf Verde incident and taking steps to protect Ms. Fleming, the complainant, (5) investigating and recommending termination of Mr. Bentley, the employee involved in the Sunset Ridge incident, (6) appealing the issuance of his PCN, and (7) investigating and recommending termination of Mr. Vittetoe, the employee involved in the Sun Outdoors Canyonlands Gateway incident. Defendant argues that of these seven situations, only two—investigating the racial discrimination claim and investigating the Sunset Ridge incident—are protected activity.

Defendant is correct. Under Title VII and the ELCRA, it is unlawful for an employer to retaliate against an employee for opposing violations of those statutes. *See* 42 U.S.C. § 2000e-3; Mich. Comp. Laws § 37.2701(a). Specifically, "an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes *to be a violation of Title VII*" or the ELCRA. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (emphasis added). Most of Plaintiff's actions have nothing to do with Title VII or the ELCRA and are not

---

[7] This investigation pertained to an incident in March 2023, where a manager was allegedly telling his employees that one of the maintenance technicians was high on prescription medications at work. Another employee informed Plaintiff that he believed the manager's comment was made with a racially discriminatory animus. ECF No. 29-3, PageID.606–07.

25

protected. For example, investigating an FHA complaint falls under Title VIII. *See Moore v. Univ. of Memphis*, No. 2:19-cv-2717-MSN-dkv, 2019 WL 8017122, at *4 (W.D. Tenn. Nov. 22, 2019) (finding that an act is not protected when it does not oppose a violation of Title VII specifically). Indeed, the FHA has its own provisions prohibiting retaliation against persons who participate in proceedings under that statute or report discriminatory housing practices, and those provisions are not interchangeable with Title VII. *See* 42 U.S.C. § 3617; 24 C.F.R. § 100.400(c)(5)–(6). Additionally, appealing the issuance of the PCN is not a protected activity: Plaintiff "was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989).

Furthermore, investigating and offering solutions regarding the Leaf Verde and Sun Outdoors Canyonlands Gateway incidents are not protected by Title VII or the ELCRA. Plaintiff himself testified that the Leaf Verde incident pertained to a safety issue—a violent resident threatening an employee—and a manager's negligence in refusing to remove the resident from the property. ECF No. 29-3, PageID.624–25; *see Ruiz-Fane v. Tharp*, 545 F. Supp. 3d 543, 557 (N.D. Ohio 2021) ("[C]omplaints about safety issues do not relate to unlawful employment practices."); *Scheske v. Univ. of Mich. Health Sys.*, 59 F. Supp. 3d 820, 827 (E.D. Mich. 2014) ("[C]omplaints about management practices or decisions rather than

26

discrimination against a protected class are not protected activities under Title VII."). Similarly, Plaintiff testified that the Sun Outdoors Canyonlands Gateway incident pertained to Mr. Vittetoe's "threatening" comments and undertones, ECF No. 29-3, PageID.642, not to any discriminatory employment practices. *Ruiz-Fane*, 545 F. Supp. 3d at 557.

Plaintiff's allegations regarding Ms. Knapp's comment about his sexuality also fall short. In his complaint and at his deposition, Plaintiff alleged that Ms. Knapp made an inappropriate comment about his sexuality—something along the lines of "you could not be gay even if you wanted[.]" ECF No. 29-3, PageID.621. Plaintiff informed the Senior Vice President of People & Culture, Ms. Fox, about this comment. *Id.* at PageID.622. But Plaintiff testified that his concern about this comment was that Ms. Knapp was not "setting a good example as a leader" and was hurting HR's reputation, because she was under the influence of alcohol when she made it. *Id.* at PageID.621–23. Plaintiff also testified that he did not see this comment as an actual insult to his sexuality, but rather as a comment on the stereotype of military members being "aggressive," "hard-nosed," "overly direct," and "insensitive." *Id.* at PageID.622–23.[8] Military status and concerns about "ineffective leadership" are not protected under Title VII or the ELCRA. *Lopez v. AT&T Mobility Servs. LLC*, 767 F. Supp. 3d 406, 432 (W.D. Tex. 2025). Plaintiff

---

[8] Plaintiff is a member of the military. ECF No. 29-3, PageID.622.

offered nothing in response to rebut Defendant's evidence, so it is undisputed that Plaintiff's report to Ms. Fox about Ms. Knapp's comment was not opposing a violation of Title VII or the ELCRA. Fed. R. Civ. P. 56(e)(2).

Plaintiff argues that Defendant ignores binding precedent that an employee may engage in a "protected activity" even if it is one of their job duties, citing *Jackson* and *Johnson*. *See Jackson*, 999 F.3d at 344; *Johnson*, 215 F.3d at 579. Plaintiff's argument is entirely inapposite. At no point has Defendant argued that Plaintiff's alleged "protected activities" are not protected because they were a part of Plaintiff's job. Rather, Defendant's argument is that they are not protected because they were not opposing violations of Title VII or the ELCRA. Plaintiff "does not receive special protection under Title VII simply because [he] handle[d] discrimination complaints" as one part of his job duties. *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 751 (6th Cir. 1986).

Accordingly, Plaintiff was not engaged in a protected activity when he (1) investigated the FHA claim, (2) investigated the Leaf Verde incident, (3) investigated the Sun Outdoors Canyonlands Gateway incident, (4) appealed his PCN, or (5) reported Ms. Knapp's comment to Ms. Fox.

**b. Plaintiff Has Failed to Establish Causation Between His Investigation of the Racial Discrimination Claim and the Adverse Employment Actions, But Sufficiently Establishes Causation Between His Investigation of the Sunset Ridge Incident and the Adverse Employment Actions**

Defendant argues that Plaintiff failed to prove causation between the adverse employment actions (the PCN and termination) and the only two protected activities: investigating racial discrimination and investigating the Sunset Ridge incident. The Court agrees that for the racial discrimination investigation, Plaintiff has offered nothing to establish causation, but finds sufficient evidence of causation as to the Sunset Ridge incident.

To establish causation at the prima facie stage, a plaintiff "must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott*, 348 F.3d at 543. "Temporal proximity between the protected activity and the adverse employment action is an important category of circumstantial evidence." *Jackson*, 999 F.3d at 349. The Sixth Circuit has explained that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of the protected activity and the subsequent employment

29

action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

The Sixth Circuit has further clarified that:

> In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn. At this point, our case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference… Indeed, we have rarely found a retaliatory motive based only on temporal proximity. Even in *Mickey*, where we articulated the principle that temporal proximity could hypothetically be sufficient in a given case, we noted the presence of additional evidence.

*Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (internal citations omitted).

Here, Plaintiff has offered nothing to establish causation between his investigation of the racial discrimination claim and either the PCN or his termination. In fact, in arguing that causation exists, Plaintiff does not mention this incident. Plaintiff does not even mention this incident in the *background facts* of his response brief to the Motion for Summary Judgment, belying any importance it may have. The only possible evidence of causation is temporal proximity—Plaintiff began his investigation four months before the PCN was issued, and six months before his termination. ECF No. 29-3, PageID.606 (stating that the investigation began in March 2023). But given that neither Plaintiff's PCN nor any documents

30

related to his termination even mention this incident, the multi-month gap between the incident and the adverse employment actions does not establish causation. *See Kimbrough v. Cincinnati Ass'n for Blind and Visually Impaired*, 986 F. Supp. 2d 904, 919 (S.D. Ohio 2013) (finding gap of five months between protected activity and adverse employment action not proof of causation because there was no other evidence supporting causation).

However, for purposes of the *prima facie* case, the Court finds enough evidence to establish causation as to the Sunset Ridge incident. Namely, Plaintiff received a PCN less than a month after he performed the Sunset Ridge investigation, and the PCN specifically mentioned Plaintiff's handling of this incident as one of the reasons he was being disciplined. ECF No. 29-13, PageID.849. Plaintiff was fired two months later. ECF No. 29-9. Not only is the temporal proximity between these events more compelling, *see Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (temporal proximity of two months sufficient to establish causation), but there is evidence that Plaintiff's handling of this investigation was something that factored into the decision to issue a PCN, with termination occurring shortly thereafter. *See Jackson v. Baxter Int'l, Inc.*, No. 1:06CV2802, 2007 WL

31

4510258, at *4 (N.D. Ohio Dec. 18, 2007) (close temporal proximity "coupled with other indicia of retaliatory conduct" sufficient for establishing causation).[9]

Therefore, Plaintiff has established causation (and, more generally, a *prima facie* case) only as to the Sunset Ridge incident.

### c. Plaintiff Has Not Established Pretext

Plaintiff does not contest that Defendant has offered legitimate, nondiscriminatory reasons for the adverse employment actions taken against him. Defendant offered almost overwhelming evidence of legitimate reasons for Plaintiff's discipline: from the beginning of Plaintiff's employment, managers and RVPs expressed discomfort with the way Plaintiff spoke with them and handled HR matters, leading to Plaintiff's first performance coaching. ECF No. 26-18; ECF No. 26-19; ECF No. 26-20; ECF No. 26-21; ECF No. 26-23. Plaintiff continued to exhibit the same behavior after the performance coaching, resulting in more complaints from managers and RVPs, which led to his performance warning. ECF No. 26-24; ECF No. 26-26; ECF No. 26-27; ECF No. 26-28; ECF No. 26-31. Plaintiff was given the PCN after he continued to make the same mistakes and

---

[9] Defendant argues that Plaintiff cannot establish causation on this issue because the evidence suggests that Plaintiff was disciplined for the *manner* that he investigated the Sunset Ridge incident, not *because* he investigated the Sunset Ridge incident. ECF No. 26, PageID.196. However, it is "not onerous" to establish causation at the *prima facie* stage. *Jackson*, 999 F.3d at 349. Defendant's argument is better considered as its legitimate, nondiscriminatory reason for the discipline, which is to be addressed when analyzing whether Plaintiff can demonstrate pretext.

suggested disciplinary actions against employees despite not being permitted under Defendant's policies to offer such recommendations. ECF No. 26-33; ECF No. 26-34; ECF No. 26-36. Plaintiff's PCN was also based on some of Plaintiff's failures to follow internal documenting processes and to close his cases. ECF No. 26-36. A subsequent audit of Plaintiff's cases showed that Plaintiff had not been documenting his cases properly. ECF No. 26-46. Ms. Bogoevski recommended Plaintiff's termination based on his documenting failures, noting that he has "not shown sustained improvement" since his PCN. ECF No. 26-48, PageID.428.

However, Plaintiff argues that those reasons are pretextual. Plaintiff claims that Defendant's reasons for disciplining and firing him have no foundation in the record and have shifted over time, that he was denied progressive discipline, and that he was treated disparately compared to other employees—namely, compared to Mr. Bentley (who was not fired despite sending a sexually harassing text message) and Mr. Vittetoe (who was not fired despite leaving a threatening letter).

Plaintiff's arguments fail to pass muster. A plaintiff can show pretext "in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). To survive summary judgment, the plaintiff must produce evidence that would allow a jury to "reject [his] employer's stated reasons

and infer that the real reason was retaliation." *Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 548 (6th Cir. 2025).

Plaintiff tries to claim that Defendant's reasons for his discipline have "appeared out of thin air post-litigation," which is evidence of pretext. ECF No. 29, PageID.526 (citing *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002)). Such an assertion is utterly contradicted by the record, which evidences months of problems that Defendant confronted with Plaintiff's quality of work and his conduct towards other employees. Similarly, Plaintiff claims that he did not receive normal progressive discipline, which is also evidence of pretext. ECF No. 29, PageID.525–26 (citing *Lamer v. Metaldyne Co. LLC*, 240 F. App'x 22, 32–33 (6th Cir. 2007)). But this assertion is entirely false. There is evidence that Plaintiff received every stage of Defendant's progressive discipline before he was fired: verbal coaching, verbal warning, and finally, a PCN.

Plaintiff argues that his disparate treatment compared to Mr. Bentley and Mr. Vittetoe supports pretext. *See Sharqawi v. Kirby Co.*, 675 F. Supp. 3d 798, 826 (N.D. Ohio 2023) ("Comparator evidence can establish pretext."). However, to make this argument, Plaintiff would have had to demonstrate that Mr. Bentley and Mr. Vittetoe were similarly situated to him in that they dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without differentiating or mitigating circumstances. *See id.* (citing *Gunn v. Senior Servs. of*

34

*N. Ky.*, 632 F. App'x 839, 847–48 (6th Cir. 2015)). There is no evidence whatsoever that Mr. Bentley and Mr. Vittetoe were similarly situated to Plaintiff; in fact, the evidence in the record is dispositive that these employees had different jobs, worked in different locations, reported to different supervisors, and were under HR investigation for different infractions.

In sum, Plaintiff has not offered *any* evidence that would allow a jury to infer that Defendant's legitimate reasons for disciplining him were pretextual, let alone that retaliation for engaging in protected activities was the *real* reason for the adverse employment actions. The record is overflowing with evidence about Plaintiff's work performance issues. Defendant's progressive discipline of Plaintiff and the reasons for that discipline are well documented. There is nothing in the record to support the conclusion that Defendant's reasons are not based in fact, did not actually motivate the adverse employment actions, or were insufficient to motivate the adverse employment actions.

Therefore, Defendant's Motion for Summary Judgment is granted as to Plaintiff's ELCRA (Count II) and Title VII (Count III) claims.

### III.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [ECF No. 26] is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the motion

35

is GRANTED as to Count II (ELCRA) and Count III (Title VII), and is DENIED as to Count I (FLSA).

The disposition of the Motion for Summary Judgment renders Defendant's Partial Motion to Dismiss and Plaintiff's Motion to Strike as moot. Therefore, Defendant's Partial Motion to Dismiss [ECF No. 25] and Plaintiff's Motion to Strike [ECF No. 28] are **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated:  March 2, 2026                                   /s/Gershwin A. Drain
                                                                 GERSHWIN A. DRAIN
                                                                 United States District Judge

36